B. G. ENGLE, Assignee, Appellee, v. LLOYD A. UNGLES, doing business under the name and style of Ungles Baking Company, Appellant.

No. 43752.

JUNE 15, 1937.

REHEARING DENIED SEPTEMBER 24, 1937.

Parrish, Guthrie, Watters & Colflesh, for appellant.

Walter J. Barngrover and Willis O'Brien, for appellee.

RICHARDS, C. J.—On December 26, 1934, a truck operated by an employee of defendant and an automobile being operated by one Clifford Redding came into collision near the town of Kellogg on primary highway No. 6. Redding was seriously injured. Claiming there was negligence on part of the employee, Redding assigned his claim against defendant to the plaintiff Engle, who, as such assignee, has brought this action for· damages sustained by Redding. From a verdict and judgment for plaintiff defendant has appealed.

Defendant claims error in that the trial court overruled defendant's motion for a directed verdict against plaintiff, the ground of the motion being that the evidence showed that Redding had received full satisfaction of his claim and had released defendant from liability prior to the assignment to plaintiff. Defendant also says there was error in submitting to the jury the question whether such release was valid and binding. The record pertinent to these alleged errors discloses that on January 10, 1935, a written instrument was signed by Redding, which recited, among other things, that for the consideration of $100 he released defendant and all other persons from all claims resulting or to result from the accident of December 26, 1934. In his answer defendant set out this purported release as a defense. Plaintiff in reply alleged that the signing of the release was procured by fraud, misrepresentation and deceit on part of the claim agent representing defendant and defendant's liability insurance carrier, and that the purported release did not constitute a settlement or release between the parties. It becomes apparent that the question raised by these assignments of error is whether there was evidence sufficient to warrant the court in submitting to the jury the matters pleaded in plaintiff's reply. To sustain her reply plaintiff relies on the mental and physical condition of Redding at the time the release was

signed, and upon alleged false representations made to him and upon the manner in which and the circumstances under which the signature was procured by the claim agent. Summarizing these matters, it is undisputed that on January 10, 1935, at the time Redding signed the release he was in bed in a hospital in Newton. He was in a cast which enclosed his thighs and left leg and foot, excepting the toes, and which extended up to the lower portion of his chest. The cast was of plaster of paris and very heavy, so that Redding was unable to move his body, and was compelled to remain in one position except as he might be moved in the bed by others. Bandages were about his head and chin but his eyes were not covered. In the collision on the preceding December 26, his left leg had been broken, the bones badly crushed and shattered so that it "felt like a bag of bones" when examined by physicians. Following the collision the broken portion was at a right angle to the leg itself. The left femur or thighbone had been driven upwards clear through its socket into the pelvis. The femur then intruded for a distance of about three and one-half inches into the muscles, nerves, blood vessels and other soft parts inside the pelvis. Three other bones of the pelvic arch, that is the pubis, the ischium and ilium had been fractured and displaced. A piece of loose bone was observed by X-ray. This intrusion of the femur inside the pelvis remained at time of the trial and has become permanent. Redding had suffered cuts about the head and face including one through his cheek that interfered with a duct from a gland, to remedy which an incision was made inside his cheek and a small rubber tube inserted. He had suffered concussion of the brain. On that account he was given a spinal puncture and intravenous glucose was administered. Unconscious when brought to the hospital, it was twenty-four hours before Redding could give his name and three days before he talked plainly at all. Thereafter he was irrational at times and did not know what he was talking about, which may have resulted from the concussion of the brain or from the medicine that was being administered. Redding's injuries were such that when first examined at the hospital the physician did not expect he would live until morning. It was a question during the first four days in the hospital whether he would survive. On account of the brain injuries morphine to relieve the suffering could not be administered for the first three or four days, codeine being sub-

stituted. During his entire stay in the hospital drugs were used to relieve pain and enable the patient to sleep, including morphine, codeine, nembutal and sodium amytal. It is the evidence of the physician that on account of the administering of these substances Redding was more or less depressed or "held down" and not able to think especially clear due to the fact that he was irrational at times, and for same reason he wasn't alert mentally. The evidence is that the limit of his ability to sleep was two to three hours of twenty-four. It is the testimony of Redding that on January 10, 1935, he was still suffering intense pain. So far as the hospital records show there was administered to him on that day the following: one tablet of A. S. A. (acetyl salicylic) at midnight, one at 4 a. m., two at 2 p. m., one at 6:30 p. m. and one at 8 p. m., the ordinary dosage being one tablet. With reference to the circumstances under which the alleged release was procured Redding, as a witness, testified: That a stranger came to Redding's bedside, representing himself as agent for the insurance company and said to Redding that the hospital was making trouble about its bill and that the insurance company had decided to pay it; that Redding told the stranger he didn't care to visit with him, didn't feel like visiting with him, but the stranger did not leave; that this stranger said it was necessary for Redding to sign some papers so that the insurance company could pay the hospital bill; that Redding told the stranger to see Redding's father; that in reply the stranger said he had talked to Redding's father and had made arrangements with him and that it would be all right for Redding to sign the papers; that the stranger said Redding's father had said that Redding should go ahead and sign. The stranger to Redding was the insurance claim agent already mentioned, name being Ettinger. The father of Redding testified that he had never talked with Ettinger and had given no authority to Ettinger to secure the signature of his son Redding. There are several matters in connection with the transaction between Redding and Ettinger concerning which Redding testified he was without recollection, including recollection of the actual signing of the alleged release and of writing his name on the back of a one hundred dollar check hereinafter mentioned and of any check being turned over to him, though witness did remember signing some paper. He testified he thought he was signing a receipt so they would pay the

hospital bill. Redding also testified that he did not remember any paper being read to him and that he did not read any paper himself. Redding testified that he relied upon the statements of Ettinger, the agent, and believed his statement that Redding's father had directed Redding to sign the papers; Redding also testified there was no conversation relative to a claim for damages, either personal or to his automobile, and that it was not his intention or purpose to settle the claim for damages in the transaction with Ettinger. From evidence offered by defendant it appears that at the time of the transaction there was a check for one hundred dollars turned over to the hospital with Redding's endorsement thereon. The lady operating the hospital testified that she applied the check on the hospital bill excepting a dollar and some cents. She claims she turned over to Redding the dollar and some cents but this Redding denied. The evidence further shows that on January 12th the hospital physician discharged Redding from the hospital. Six men lifted and placed Redding on a cot. The cot was lifted through a sleeping car window at Newton on the afternoon of January 12th. Redding reached Limon, Colorado, in the middle of the next day. A handful of pills was handed to Redding at the hospital to use to relieve pain while on the train. It appears from the record that the drug in the pills was codeine. The abstracts of the record were prepared in such manner that it has been necessary to glean the evidence from the voluminous transcript, but we have attempted to find and set out the salient matters. It should also be stated that defendant's witnesses controvert some portions of the evidence above mentioned.

On the question whether the record in this case generated a jury question upon the issues of plaintiff's reply we are aided by previous pronouncements of this court. In Owens v. Norwood-White Coal Co., 188 Iowa 1092, 1115, 174 N. W. 851, 860, there was a similar issue. After reviewing authorities the opinion states:

"The rule to be deduced from the precedents is not that, in order to justify an avoidance of a release, it must be established that he was, at the time, a mental incompetent. It is sufficient if it appears that, by reason of bodily injury or infirmity, or mental distraction occasioned thereby, he is, to use the language of the Wisconsin court, supra, unable to 'carefully

consider his rights in the matter,' and if it further appears that advantage was taken of that condition by the other party, to obtain a settlement for a very inadequate consideration. Inadequacy alone, if so great as to shock the conscience, has been held enough to require that the release be avoided. Russell v. Dayton Coal & Iron Co., 109 Tenn. 43 (70 S. W. 1).''

There is also found in the same opinion the following:

''It is an elementary proposition that the law favors settlements, fairly obtained, of disputed claims. It is no less true that contracts of settlement may be vitiated by fraud or inequitable advantage by either party thereto. To hold otherwise is to offer a premium for the encouragement of fraud and inequitable advantage, which it is the true mission of the courts to prevent. In considering a claim or allegation of fraud in such cases, the court will inquire, not alone into alleged false or deceitful or misleading representations, but into the circumstances attending the transaction, tending to show whether the parties were dealing at arm's length, and upon equal footing. This is especially true where the settlement sought to be impeached is one between an employer and an injured employee, made at a time when the employee is still suffering from his injury, and it is alleged that advantage of his weakness, physical, mental, or both, was taken by the employer, to obtain from him a release of his damages upon payment of a grossly inadequate consideration.''

Also from the opinion:

''Again, in passing upon the question whether a release may be disregarded as having been procured by fraud or mistake or inequitable advantage, it is well settled that evidence is admissible tending to show that the settlement was obtained when the party seeking to avoid it was still suffering from his injury, was sick or distressed, or unnerved and unfit to cope with the other party, or to properly apprehend and protect his legal rights.''

At the conclusion of the opinion appears the following:

''It is only where such release has been procured by fraud or by mistake, or under circumstances showing such superior advantage on the part of the releasee as taints the transaction with constructive fraud, that the settlement will be treated as

void. When, however, there is any evidence fairly tending to show that it ought to be avoided on any of these grounds, or to justify such finding by a jury, the question so presented is for the jury.''

In Kelly v. Railway Co., 138 Iowa 273, 280, 114 N. W. 536, 539, 128 Am. St. Rep. 195, we said:

''While it is and should always be the policy of the courts to encourage the amicable settlement of all controversies, it is even more a matter of good policy and good morals to stamp the law's disapproval upon settlements which bear the taint of fraud and undue advantage.'' See, also, Platt v. Plaster Co., 169 Iowa 330, 151 N. W. 403.

In view of these pronouncements we are convinced the trial court properly submitted to the jury the question as to fraud in the procuring of the release. Admittedly Redding had sustained, and was suffering from, almost the extremity of bodily injuries. The jury could well have found from the evidence that distracted thereby, enduring intense pain, he was unable to carefully consider his rights in the matter or deal at arm's length or on an even footing with the claim agent, especially when he was not mentally alert and not able to think clearly on account of his recent brain injuries and the continual administration of the drugs or substances necessary to enable him to endure the pain. It is equally apparent that the jury could well have found that the claim agent knowingly took advantage of Redding's such condition, and persisted in his purposes after being informed by Redding that he did not feel like visiting with him and after being requested by Redding to see the latter's father. The jury could also well have found that it was on account of plaintiff's condition that the agent was able to induce Redding to sign what he thought was a receipt for the hospital bill and to believe his father had sent word that he do so. We are unable to sustain defendant's contention that on this record the trial court should have held that there was neither entrapment nor fraud.

While the general rule is that fraud in procuring the signature to a written instrument vitiates the same, it is also true that there is an exception to this rule, where the signer of the written instrument is guilty of negligence in the execution thereof.

State Sav. Bank v. Deal, 200 Iowa 490, 203 N. W. 293. In McCormack v. Molburg, 43 Iowa 561, 562, the court said:

"The defendant does not state that plaintiffs used any artifice to prevent him from reading the contract, nor does he state that he was unacquainted with the English language, or that he could not read. In fact no excuse whatever is given, except that he signed the contract relying on the representation of plaintiffs as to its contents. This is inexcusable neglect, and the defendant must suffer the consequences of his own folly."

Relying on this exception to the general rule, and upon Crum v. McCollum, 211 Iowa 319, 233 N. W. 678, the defendant insists that Redding was guilty of inexcusable negligence in signing the release and is estopped from claiming the release is not binding. In support thereof defendant points out that Redding, 22 years of age, had had a common and high school education at Limon, Colorado, and had spent nearly two years in an agricultural and teacher's college, in preparation for teaching school, and that he had in fact taught a country school in Colorado, at $75 per month, for over a year prior to the accident. But in making this contention defendant fails to recognize the fact that there was evidence from which the jury could well have found that Redding was not in physical or mental condition, nor able, to exercise the same degree of care and caution and discretion expected of an ordinary person of like education, acting under ordinary circumstances, possessing normal physical health and a normal mental state. That these circumstances were to be taken into consideration is held by the authorities already cited. It was not for the trial court to hold Redding, if in the condition indicated by the evidence, to the same degree of care as would be exercised by an ordinary person in normal conditions. On the question of negligence we are satisfied that the extent of care and discretion required of Redding, in view of the record, was for the jury. Neither in Crum v. McCollum, 211 Iowa 319, 233 N. W. 678, nor in any other Iowa authority to which our attention has been called do we find a holding that there was negligence *per se* in a record comparable to that before us.

▮▮▮ Defendant claims the court erred in failing to instruct the jury on "the issue of estoppel" and "in failing to give defendant's requested instructions of a similar nature on the

subject.'' In argument defendant points out that in his rejoinder to plaintiff's reply defendant alleged that Redding was a well educated man, had full opportunity to read the release and did carefully read and understand the same and that defendant relying on Redding's signing the release paid Redding $100 and that by reason of such facts plaintiff and Redding are estopped to deny the validity of the release or to claim it was procured through fraud. But this plea of so-called estoppel appears to be no more than an allegation that Redding had been guilty of such negligence that it was denied to him to rely on the fraud, if any. Estoppel in the ordinary sense of the word was not plead. Several of the instructions requested by defendant directed the jury to find for defendant on account of the alleged negligence of Redding. They were rightly refused. In the instructions the court did give, the jury was advised that the execution of the release by Redding was not denied, and the jury was then quite fully instructed as to the matters that must be shown by plaintiff by a preponderance of the evidence before the jury would be warranted in finding that the paper signed by Redding was not a release and satisfaction of the claim. We find the instructions were sufficient, in that respect.

Defendant claims the court erred in instructing that the burden was upon plaintiff to prove by a preponderance of the evidence that Redding was not guilty of any negligence that contributed in any manner or degree directly to the accident and damages sustained by him. The complaint is of the use of the word ''directly''. Defendant says that the contributory negligence which would bar plaintiff from recovery need not contribute *''directly.''* This question has been determined adversely to defendant in Engle v. Nelson, 220 Iowa 771, loc. cit. 778, 263 N. W. 505. The inclusion of the word ''directly'' is in accord with definitions of contributory negligence many times approved by this court. Towberman v. D. M. Ry. Co., 202 Iowa 1299, 211 N. W. 854; Meggers v. Kinley, 221 Iowa 383, loc. cit. 404, 265 N. W. 614.

Defendant in his answer alleged that Redding was negligent in driving at an excessive rate of speed and in failing to have his car under control so that he would be able or was able to stop within the assured clear distance ahead. The court advised the jury of this defense and then proceeded to instruct as to the assured clear distance ahead statute. Defendant assigns this as

error saying there was no such issue in the case raised by plaintiff with reference to the negligence of defendant's employee. But we find no error because the evidence was such that good practice required that this very issue raised by defendant be submitted to the jury under appropriate instructions. That is what was done by the court. Lang v. Siddall, 218 Iowa 263, 254 N. W. 783; Johnson v. McVicker, 216 Iowa 654, 247 N. W. 488.

■■■ Seven specifications of negligence are found in plaintiff's petition. Of these three were submitted to the jury. After both parties had rested, and before the court gave its charge, defendant moved that there be withdrawn from consideration by the jury two of said three specifications on the ground that the allegations constituting these two specifications were "the mere opinion and conclusion of the pleader and not the statement of a fact." In discussing defendant's claim that the court erred when it overruled this motion, Chapter 491, Code of 1935 (section 11108 et seq.), subject matter pleadings, cannot be ignored. Were the portions of the petition, at which the motion was directed, amenable to the objections mentioned in the motion, then Chapter 491 had prescribed the manner of raising and settling the question and had furnished defendant with all necessary means of so doing. The right to file an appropriate motion made available to defendant the means so provided. But to the end that the pleadings and issues be settled before the trial, throughout which the rights of the parties have a dependence upon the pleadings, the legislature had fixed a time limitation with respect to the procedure just mentioned. The limitation is found in section 11135, which provides that the motion that was available to defendant must be filed before the filing of the answer. Defendant chose to do otherwise than follow this statutory procedure laid down for settling questions of the sufficiency of portions of an adversary's pleadings. On the contrary defendant filed answer and went to trial. We find nothing in our statutory system of practice that entitled defendant to postpone as he did the determination of this question of pleading that should have been raised before answer, and to have the matter determined in contravention of section 11135. There is not involved here a motion in arrest of judgment allowable under section 11150 when the petition fails to state a cause of action. Nor do we find anything in Townsend v. Armstrong,

220 Iowa 396, 260 N. W. 17, cited by defendant, in the way of discussion or consideration of these statutory provisions. Nor in the case before us can it be said that perchance the motion should have been sustained because of lack of evidence to support the two specifications. The record reveals that there was such evidence.

■■■ Defendant claims as an error that the jury was not instructed that the burden of proof was on plaintiff with respect to his allegations in avoidance of the signing of the release. In instruction I the court gave first consideration to the release and plaintiff's claims with reference thereto and in substance charged the jury that they should first determine that issue, and should proceed no further if they found the written release was a valid agreement. In this part of the charge the jury was advised that the execution of the release was not denied by plaintiff and set out the matters alleged by plaintiff in avoidance. This instruction further charged the jury, in substance, that if they found from a preponderance of the evidence that the matters in avoidance of the release had been established, then the jury would be warranted in finding that the papers signed by Redding will not avail defendant as a defense. In the following instruction II, the court elaborated somewhat on instruction I. In instruction III, the jury was advised that when it is said that the burden rests upon either party to establish any particular fact or proposition by a preponderance of the evidence it means that the evidence offered and introduced in support thereof to entitle said party to a verdict should when fully and fairly considered produce the stronger impression upon the mind and be more convincing when weighed against the evidence introduced in opposition thereto. In instruction IV, the jury was advised that by "burden of proof" is meant the obligation resting upon a party to prove the truth of an allegation made by him which is denied by the opposing party. It was, of course, necessary that the jury be informed that the burden of proof was upon plaintiff with respect to his attempted avoidance of the release he had signed. The only question is whether this was accomplished. We are not justified in requiring that instructions be in any stereotyped form or that the courts should use any given style of expression. Reviewing instruction I it charged the jury that in event they found certain facts, then the release would not prevent plaintiff's right to recover. As part of such instruction

they were also advised in substance that such finding must be by reason of a preponderance of the evidence, and this in connection with what appears in instruction III, as above shown, placed the burden of proof on plaintiff, in substance, though not in words. See Waltham Piano Co. v. Lindholm Furn. Co., 168 Iowa 728, 150 N. W. 1040. While the question would have been obviated had not the trial court failed to specifically say that the burden of proof, defined in instruction IV, rested on plaintiff with respect to this particular issue, yet in view of the instructions that were given we are convinced the jury, assuming it was of ordinary intelligence, understood the matter aright.

The jury awarded plaintiff $26,950. Thereafter such proceedings were had before the district court that plaintiff agreed to accept $20,000, and remitted the portion of the verdict and judgment in excess of that amount. Defendant now urges that the district court erred in not sustaining defendant's motion to set aside the verdict for the reason that it was excessive. Plaintiff's assignor's injuries were so unusually severe, and in a large measure of such permanent nature, that we are unable to say that the judgment as finally rendered was so excessive that there should be a reversal.

Other assignments of error having to do with objections to testimony, the incorporating of pleadings in the instructions, the refusal to give requested instructions, the conduct of plaintiff's counsel, the injection of evidence that defendant carried liability insurance, and want of evidence of future pain and suffering, and other matters, have had consideration but without finding therein prejudicial error.

The judgment of the district court is affirmed.—Affirmed.

PARSONS, HAMILTON, ANDERSON, KINTZINGER, STIGER, and SAGER, JJ., concur.